1st argued case this morning is number 19, 1105 Cochlear Bone Anchored v. Oticon Medical Good morning. May it please the court. Laura Burson on behalf of Cochlear. I'd like to start with the board's construction of the claim term induction that appears in both claims 11 and 12. After weighing the evidence, the board concluded that induction in the plain and ordinary meaning of induction is electromagnetic induction, and that the plain and ordinary meaning of induction applied to claims 11 and 12. And that conclusion is supported by the intrinsic record. Claim 12, which depends from claim 11, part of the intrinsic record, and it includes the limitation power is transmitted by induction. It includes that limitation. Claim 12 further specifies that the component, the internal component that is being powered by the induction is a rechargeable battery. And no one disputes in this case that the principle of operation to charge a battery by electromagnetic induction is electromagnetic induction, and that requires an internal receiving coil where current is generated inside the patient to charge this rechargeable battery. And there's no dispute in the record, there's no other evidence in the record that any other structure would be able to charge a rechargeable battery by electromagnetic induction without a receiving coil. And the record evidence is consistent with that arrangement and that meaning of electromagnetic induction. We have LACIFER, the 996 application, which was in the prosecution history, so it's part of the intrinsic record. The examiner relied on LACIFER. At Appendix 1166, LACIFER 996 shows that arrangement. There is an internal receiving coil. The LACIFER reference that Oticon itself relies on at Appendix 929, 930, 928, and Figure 1 shows this internal receiving coil. Dr. Rubenstein's testimony is also consistent, 1736, and then the board itself cited two dictionary definitions, Appendix 2752 and 2756. But is your complaint really with the construction or is your complaint with what the board ultimately concluded that the prior art references showed? It's the latter, Your Honor, because the board correctly determined that the meaning of induction is electromagnetic induction. And then when it analyzed the Hough reference, which does not have a receiving coil, it's not doing electromagnetic induction. It's charging or it's vibrating a magnet by an external coil, but it does not have any internal receiving coil. And there's no dispute in the record about that, that what Hough is doing, it does not have a receiving coil at all. And so the board disregarded its own correct interpretation for electromagnetic induction, which does require this structure, that there be an internal receiving coil. And Hough clearly doesn't have it. It didn't even have any need for, it didn't have any internal components that were powered. In fact, the board specifically made that finding about Hough when it discussed Claim 12. This is at Appendix 83. It says, we recognize that the Hough's device does not include any implanted components that require power, end quote. But that's exactly the claim requirement in Claim 11, that there is power that's being transmitted to the internal components of the device. And Claim 12 makes it clear that it further specifies what that internal component is, that it is a rechargeable battery. So had the board correctly applied the meaning of what electromagnetic induction means to a person of skill in the art, and there's no evidence in the record that a person of skill in the art would interpret a vibrating magnet by an external coil to be the same thing as electromagnetic induction. There is one statement by Dr. Propelka, and it's a conclusory paragraph. It's at 1302, and he just says it. He doesn't give any explanation as to how or why, or he doesn't even provide any backup reference that a person of skill in the art would interpret this vibrating magnet by an external coil to be electromagnetic induction. And yet there are plenty of references in the record, I think I've just given about three or four, that are consistent with Cochlear's understanding of electromagnetic induction, that it does require this receiving coil. So there's no evidence to support this vibrating magnet by an external coil is the same thing, would mean the same thing to a person of skill in the art for electromagnetic induction. And on that basis, the board's finding is erroneous and should be reversed. There's nothing to remand for, because there's clear evidence, no one disputes, that Hough does not have this internal receiving coil. I'd like to talk about Claim 12, unless there are questions further about Claim 11. Claim 12, the board erroneously concluded there was a motivation to combine the Hough reference with a Cochlear implant, and that finding was based on hindsight reconstruction and is not supported by substantial evidence. The only basis that the board relied on for making this combination is an alleged reduction in size and aesthetics. But there's no evidence in the record what the product, what size it would have been, or that there would have been any reduction in the external components by adding this battery. Because no one disputes that Hough does not need any battery. The board found there's no parts inside that need any power, so it has no need for a battery. So either by adding the battery, you're going to end up with a device that has a battery that's just sitting there in someone's head, not doing anything, or you're going to be changing the principle of operation. The principle of operation, again, is this vibrating magnet by this external coil. If you're adding a battery, then you're changing that principle of operation. This turns on your argument that it has to be electric power that we're talking about, right? Well, it turns on the argument, they combined Hough with Lasifer, so there's an acknowledgment that Hough by itself is not doing, they're charging the battery. Right, it's not an anticipation finding. Yes, exactly, whereas the other is an anticipation finding, claim 11. So here, they're combining the two, and they're saying there's a reason that a person of skilling would have combined the two because of this alleged reduction in size. But my point, Your Honors, there's no evidence there would have been any reduction in size, and combining the two doesn't give you a streamlined product. It gives you either a product with a battery that's not doing anything, or it's completely changing the principle of operation. And in fact, the Board's own finding here undermines its conclusion of motivation, because its own finding is that this combination would be a substantial redesign. So at best, at best, this is a motivation, a generic motivation to build something better. And we've cited cases in our yellow brief, page 62 and 63, that a generic motivation to combine is not sufficient. So the Board's finding with respect to size and aesthetics you think is just not supported by the evidence? The only basis that there is no finding as to what would be the result in terms of size for the product. It's just this generic interest to make something smaller. But there's no evidence that there would actually be something smaller. Well, if you're removing a portion of it, doesn't that make it smaller? Well, we're actually adding to it. We're adding a battery. We're not removing anything. That's my point, Your Honor. We're adding structure instead of taking structure away. And there's some alleged allegation, I guess, that by adding this structure inside is somehow going to change and make the structure on the outside smaller. But there's no evidence of that. And if you did something different to the outside, then now you're going to be changing the principle of operation of how the device works to begin with. So there is no basis other than some generic interest to build something better. Well, I mean, explain what you mean by changing the principle of operation. I mean, whenever you're modifying a reference to combine two, there's a big difference between changing the principle of operation and completely undoing the way it operates. So, of course, you're changing the principle of operation when you combine two references. Well, there could be an example where you could add something to an existing device to add a feature. But here, it's undisputed that this device, the Huff device, works with this external coil. And it has no ability to use anything to power anything on the inside. So we would have to be adding structure on the inside to do something with the magnet. But then you have the outside is not going to be operating in the same way that it was with the magnet on the inside. So there is no dispute as to how Huff itself is sending bone conduction signals to the patient's ear through this external coil and this magnet. And by adding this alleged battery, then presumably it's going to be used now, the principle of operation of how Huff is, it's going to be used in some way, or it's not going to be used at all. If you're still going to stick with the way Huff is designed to have this external coil vibrate the magnet, then there's no purpose for the battery because there's nothing in the Huff device to be powered by any power. So there's nothing to be powered by a battery. And so in that sense, you're either putting in a component in the device that's not going to be useful because there's nothing there to use it, or it's going to change the principle of operation because now you're not using the external coil to vibrate the magnet, you're going to be using the battery to somehow vibrate the magnet. So that's why it would be changing the principle of operation. And then if there are no further questions on Claim 12, I'll briefly touch on our preamble argument that we have for Claims 4, 5, and 6 and 12. The preamble in this case breathes life and meaning into the claims. And there's two bases for that. There's the antecedent basis. The preamble provides antecedent basis for the claims. There are the skull bone and the patient elements in the claims, and that comes directly from the preamble. But I think the most important one is the essence of the invention point here, is that the inventor clearly defines its invention for a bone conduction hearing device for treatment of single-sided deafness, patients with single-sided deafness. And the inventor... How does that, even if, because the board found in the alternative that even if it was limiting, it wouldn't matter. So how does the fact that it's used for a particular type of condition change the structure of the elements that are then disclosed? It has to do with the board. Because the board disregarded the essence of the invention, that it was for treatment of single-sided deafness. I mean, this patent says that it's an improvement. It contrasts its invention over the ordinary bone conduction device. So this is considered to be an improvement patent. And so by the board's disregarding the essence of the invention, that it was for treatment of single-sided deafness, it disregarded certain evidence in the record. It didn't even consider certain evidence in the record. So, for example, in connection with Claim 12, it didn't consider the fact that the Huff device, the Huff authors of that publication themselves, found the evidence very equivocal as to whether or not the device helped individuals with single-sided deafness. And so we pointed to that as another basis for not... So are you saying that the prior art device had to have intended to serve the precise same purpose in order for it to be considered relevant prior art? I don't believe that's what I'm saying, Your Honor. But I'm saying that we had evidence in the record as to why an individual, a person of skill in the art, would not have, and to go back to the Claim 12 example, would not have combined the Huff device with... I mean, this is a substantial evidence analysis, and the board cited to expert testimony that they would have combined the two. That, you know, you could look at it more broadly, that any time you're dealing with trying to deal with deafness, you might have things that were for different types of hearing conditions, but that when you look at them, I mean, are you saying we should define the scope of the art differently because of this preamble? I guess I'm saying we should define what evidence... There is additional evidence that should have been considered that the board disregarded, did not even address the evidence because of its determination that the preamble was not limiting. And so, for example, I mentioned the Huff device and the teaching in Huff that this teaching away, that it didn't recommend its device for patients with single-sided deafness. There's also evidence, the Banaclue reference that's used for obviousness for Claims 4 and 5. Banaclue never mentions anything about transcranial attenuation, any reason to address transcranial attenuation. It talks about head shadow effect, the air conduction of sound, but it doesn't talk about bone conduction of sound, attenuation. The board didn't consider that evidence because... I guess I'm still trying to understand, and I've read this multiple times and trying to sort of drill down on why you think this preamble limitation is meaningful. Do you think it's meaningful because it limits the prior art that the board is allowed to consider? That somehow the scope of the art can only relate to this hearing condition? Or so why is it so important? Because there are complete structures that are disclosed in the substance of the claim. It limits the way the board would combine the art, Your Honor. There isn't any other art. It's Huff, and it's Lasifer, it's Carlson, but it limits the way and how the board views the disclosures in those references and what they're teaching. And I see my time is almost up. I'll hold the rest for rebuttal. It is more than up, but we'll save you some rebuttal. Thank you, Your Honor. Okay, Mr. Andrews. Yes. Good morning, Your Honors, and may it please the Court. The 040 patent has a detailed description that is less than one column in length, and much of the text from that one column relates to subject matter that the patent owner disclaimed during ICPSR. The 040 patent further includes three figures which are rather rudimentary and fail to include any significant detail. But it is true that the entire patent talks about the single-sided deafness, right? Your Honor, the patent does talk about single-sided deafness. There was one method claim, a method of treatment. That claim has been disclaimed. So the only claim remaining or claims remaining are directed to the apparatus. So as you pointed out, I think you were alluding to in your question, the question is what is the apparatus? What are the characteristics of that apparatus? And that has been the focus of the petition, and that has been the focus of the appeal. You touched upon the preamble, and not only did the board conclude that the claims are impenetrable, even if the preamble is given patentable weight, but they extensively considered the issue of the preamble over six pages of their decision, and they found that at best the preamble recites an intended use and does not further limit the structure of the apparatus. Okay, so even if it doesn't limit the structure of the apparatus, as I'm beginning to understand your friend's argument, it is more that it should have limited or expanded, depending on how you're looking at it, what the board considered regarding how APOSA would choose to combine the references. Well, Your Honor, in terms of the combination, if we're talking about claims four and five, the Vaniclu reference clearly describes successfully treating patients suffering from sickle-sided deafness using a bone-anchored hearing device. So the only reliance on the secondary reference was based on the understanding that Vaniclu is a technical publication describing a clinical use of a product, but it didn't go into detail of the physical characteristics of the Baha device being used therein. The only reliance on Carlson was to fill some of those gaps to the extent they existed. The petition nor the final written decision from the board relied on Carlson for treating single-sided deafness. The only reliance on Carlson was basic physical characteristics of the Baha, such as an implantable screw and a vibrator. The primary reference, Vaniclu, from just before a year, before the earliest filing date of the 040 patent, clearly taught successfully treating patients suffering from single-sided deafness using a Baha device. So there's no teaching away. It's simply a matter of the argument about teaching away is misdirected because it doesn't reflect what the actual combination is. The reliance on the secondary reference Carlson was quite limited, just to fill in those specific physical gaps. But what about Claim 12? So Claim 12, again, it's an apparatus claim. So how does the apparatus distinguish over the prior art? And, you know, Claim 11, same basic situation. The Hough reference actually describes using a bone-anchored device to treat single-sided deafness. It describes that treatment as a desirable application. It describes how some patients... But does the use of an internal battery completely change the operation of Hough? No, Your Honor. In fact, if we look at the 040 patent, the only illustration of a rechargeable battery is in Figure 3. And there really are no implementation details whatsoever. So it's difficult to make this argument of changing principle operation when there's really nothing in the 040 patent to suggest that they've designed any particular way to implement a rechargeable battery in a bone-anchored hearing device. As we see in LifeSafer, which is an implantable-type hearing device, using a rechargeable battery was known. Not only was using a rechargeable battery known, but the implanted part in LifeSafer includes additional components that take advantage of that rechargeable battery, including a DSP, digital signal processor, 141, as well as an analog-to-digital converter, as well as memory that stores operating parameters. So this characterization of the combination as simply plugging in a rechargeable battery where none exists is not consistent with the grounds of patentability that the Board actually decided. That wasn't the grounds of patentability presented in the petition. The grounds of patentability presented in the petition presented and relied on expert testimony showing that it would have been obvious to not only include a rechargeable battery, but also to include additional components in that implanted part, and that is specifically what's taught in LifeSafer. In fact, the Board pointed to the mention in LifeSafer with respect to Claim 12 that having a large, bulky external hearing aid in the vicinity of the ear has a stigmatizing effect, and patients will tend not to use this device. Your argument, I mean, your opposing counsel says that there would, there was no evidence that it was going to be more aesthetically pleasing if you changed HUF. That they said that, that that would be the motivation, but there was no evidence to support it. Well, again, it's an issue of substantial evidence. The Board looked at that evidence, particularly LifeSafer, where LifeSafer specifically recognized, here's a problem. A large, bulky external device stigmatizes users. It's also referred to in the Koken article, Appendix 1343, that's discussed in Dr. Propelka's declaration. I get that. That's the basic principle, that you want it smaller, you want it, but the point is, is there anything about HUF that becomes smaller or more aesthetically pleasing if you alter it in the way that the Board proposes? Sure. If we're moving processing, the digital signal processor, or a processor at all, into the internal part. If we're moving the memory that stores the operating parameters of the device. If we're moving the programming that would dictate the signal processing that's being performed to benefit the patient. LifeSafer specifically recognizes that moving these things into the internal part addresses this stigmatism problem. Now, obviously, patent owner may disagree, but it's really an issue of substantial evidence. And the Board cited specific evidence. What specific evidence did the Board cite to say that HUF would be rendered more aesthetically pleasing? They cited to LifeSafer, which was the secondary reference, combination with HUF, and that the rationale was, if you take processing from the external part and move it into the internal part, that reduces the processing and the battery requirements of the external part. The elements that drive the stimulation, the output stimulation to the user, if those are in the internal part, it stands to reason that they don't need to exist in the external part. Okay. Thank you. I would like to briefly touch upon Claim 11 and the issue of power and induction. The patent owner argues that power must mean electric power, even for Claim 11, where there's no rechargeable battery, and that induction must mean electromagnetic induction. Neither Claim 11 nor the 040 patent use the term electric power, electrical power. They never use the term electromagnetic induction. During IPR, we submitted a translation of the Swedish, or at least a relevant portion of the Swedish filing. What did the Board conclude as to Claim construction of those two terms, power and induction? For power, it was a bit more clear. They clearly rejected the patent owner's argument that power must mean electric power. Right, and induction. And by extension, induction, or if you want to say electromagnetic induction, does not require some nondisclosed internal coil for generating electricity. It's a natural consequence from the Board's interpretation of power. I remember the Board said, there's a paragraph that quotes a couple of dictionaries that induction is electromagnetic induction, and then the Board says we agree with that, but we don't think a current or a voltage needs to result as part of that. Is that what that quote said? I think that's basically accurate. On page 44 of their decision, they do cite a computer dictionary, which this technology here is not a computer. They cite an IEEE standards dictionary, which is not the technology at issue either. But on the very next page, they make it clear that when they're using the term electromagnetic induction, if we're, despite the specification and the claims never using that term, that does not require an internal part for generating electricity. And here we have the Hough reference that uses the same terminology. It refers to the transcutaneous transfer of inductive electromagnetic energy. So it's important to recognize how this terminology was actually used. In the actual field, the Board looked at the issue really as one of inherent disclosure. There's no inherent disclosure in Figure 2 of a battery, or an implanted battery. The only implanted battery is the rechargeable battery 10 in Figure 3. In fact, Hannon recited to that figure, to element 10, and the original claims as filed included parentheticals where they pointed to numeral 10, they're referring to the configuration of Figure 3, which isn't the relevant embodiment for Figure 2. In Figure 2, the only description of an element in the implanted part is a vibrator. And the Board correctly concluded that a vibrator, as in Figure 2, does not inherently require a rechargeable battery or any mechanism for generating electricity. So, Your Honor, we agree that it would have been cleaner if the Board simply said, the claim uses the term induction. It doesn't use the term electromagnetic induction. And under the broadest reasonable interpretation, we are not going to add language that isn't in the claim. It's not even in the specification. But I thought there was really not much dispute that electromagnetic induction and induction were essentially the same thing. The only dispute was, what does that ultimately mean in terms of what the structure would have to look like? Well, Your Honor, we disagreed with the argument that induction and electromagnetic induction are synonymous terms. Induction itself is generic. But you have a Board decision that that piece of the claim construction went against you, but then said it reads that its own construction not to require an internal coil. Are those two things consistent if you accept the Board's view that induction does mean electromagnetic conduction? What the Board said is that it ordinarily means electromagnetic induction. I should say plain and ordinary. They say ordinarily, yes. Sorry. At the top of 45, right, ordinary. Ordinarily, although we agree that it ordinarily means. They said it's the plain and ordinary meaning. Ordinarily means. Right, but on 44, it's plain and ordinary. That seems to be endorsing the equivalence of the concepts and then saying either and here or but here. I'm not quite sure what it means. But you still don't need an internal coil. Correct. And that's ultimately in the context of this patent. That's the issue. What does it mean in the context of the 040 patent? And there, despite what the Board said on page 44, which granted, I'm not sure why they went there, but they did. But on page 45, they recognized that in the context of the 040 patent, there's no requirement in Figure 2 for an internal coil that generates electricity. Do you have a cross appeal here? We do. Yes. Can I just ask you? Yes. So let me just state a view for you to react to, not necessarily my view. So Samsung recently said indefiniteness does not translate one way or the other into a categorical ability or inability to address obviousness. It depends, rather, on what kind of and how much indefiniteness there is. So that Nick's method apparatus indefiniteness, the court actually remanded and said, that by itself does not necessarily preclude an obviousness ruling. Here, it seems to me, we have 7 and 9 in one category and 10 in the other. 7 and 9 is indefiniteness as a result of it clearly being a means plus function claim and absolutely no structure, which means there is a big inkblot in the middle of the claim and you can't apply prior art to an inkblot. But 10 is different. And or. Right? So it says a directivity means comprising a directional microphone or a directivity-dependent microphone. And or directional microphone. And or. And that means essentially two things. A directivity means including a microphone or a directivity means including a signal processing means. That second part is in the same category as 7 and 9, namely no structure, because that's means plus function. But that first part is not necessarily even a means plus function claim because it specifies a structure right in the claim. So why wouldn't the board be able to do an obviousness analysis on that even if it can't do one on all the rest? They could, Your Honor. In fact, for the directional microphone, there's no even mention in the specification of directional microphone. The 040 patent is relying entirely on the technology. But as for the directional microphone, it might not even be a 112.6 claim at all. The board did not adopt a 112.6 paragraph interpretation for the directional microphone. They just focused on the first part of the claim. But our position is that they. Well, they said what the board said is we've got to construe the claim as a whole. And they didn't parse out the and versus the or. Right? They looked at means plus function interpretation as the first step. It was starting on page 20 of their decision and found that the directivity means was means plus function. They did not adopt a means plus function interpretation for directional microphone. And they just determined. They just didn't address it. They just didn't. They didn't address it. No. And it's. Our position is that they could have conducted an obviousness analysis for not only claim 10, but also for 7 through 9. But not the entirety of claim 10. Not the entirety of claim 10. The signal processing means. Well, I think frankly they could have. I recognize the 040 patent does not refer to any structure that would possibly distinguish over the prior. The board recognized that claims 7 through 10 relate to a mere 13 lines of disclosure. Essentially a single sentence. It's a laundry list of well-known hearing aid components. Yeah, but don't you have to have claim construction before you can do an obviousness analysis? There certainly are situations where you don't need to define the outer boundaries of the claim to identify an example that falls within the scope of the claim. And here you have the patent owner admitting that digital signal processing means would be satisfied by a known digital signal processor. So the issue is actually teed up for the board to conduct an obviousness analysis because of the submission. There's no argument that the 040 patent disclosed any unique digital signal processing means. If the board were limited to conducting an obviousness analysis just on the directivity means comprising a directional microphone, full stop. Have you made an argument that there's some prior art showing that directional microphone? We have, Your Honor. We relied on the Lisinski reference and the board simply didn't conduct the obviousness analysis. And again, there's no argument that there's anything unexpected about using a directional microphone in a bone-anchored hearing device. In fact, it was an afterthought. The 040 patent never mentions a directional microphone. The only place it shows up is in the claim. So, you know, our contention is that there was nothing unique about a directional microphone. Okay. Let's hear from the other side and we'll save you a rebuttal. And let's give this person the full rebuttal time. Five minutes. Thank you, Judge Newman. So I'd like to start, Judge Toronto, with the last question there that you asked my colleague about with the Sampson case and the iPixel issue. So here, the board, there isn't an iPixel issue with these claims. And the reason, as I understand the Sampson decision, that it was remanded was so that the board could consider iPixel issue, that it had stopped short of evaluating those claims because it had found Section 112 issues in those same claims. We don't have that situation here. And, in fact, the board below did consider the arguments about claim construction and I think correctly recognized that Oticon didn't say that the patent owner's construction was the correct construction. They just, so it wasn't an agreed upon construction, per se. They just said, use it for this proceeding. And I think the board correctly recognized that claim construction is within the purview of the court or the board. And they disagreed with that claim construction. And so they already considered these claims in connection with that construction and decided that they could not render a patentability analysis. But what the board said, as I understand it, is the board said, well, we get that there is this one specific structure that's identified and claimed. But because it also claims this other digital processing means and it's a means plus function claim, therefore we have a 112 problem. But I don't see the board actually saying it's impossible to construe one portion of the claim when you've got an and or, because the or has to be meaningful. Well, I think it's because of the and. And I can't remember the exact language that the board used, but they said that the two were tied together. But they're not, because and is only one alternative. The fact is that the claim language would literally embrace something with a directional microphone, full stop. And if that was shown in the prior art, there would be something in the prior art within the coverage of the claim that would invalidate the claim for that reason. But I think the issue then, Your Honor, is whether the board could have or whether it was required to. Okay. So here the board looked at these claims and it determined that it was not able to construe them because of 112 issues. You know, whether the board could have gone on and done as you say, that might have been a scenario. But was it incorrect for the board to stop short saying that this would not have been a meaningful comparison because we can't interpret with reasonable certainty the scope and the meaning of these claims. And then to touch on something about motivation to combine that was raised with counsel, I believe it might have been you, Judge Newman, I understand or I appreciate that we're looking at, that this is a substantial evidence finding. Is there substantial evidence to support this combination of references? But the substantial evidence has got to be, would a reasonable mind accept this evidence to be adequate to support the conclusion? And I would submit, Your Honor, that would not, a reasonable person would not find the evidence adequate. That the only evidence in the record that adding this battery to Huff would reduce the size is at 1305 and 1306. And again, it's a conclusory statement by Dr. Popelka that doing so would result in a smaller size. But saying it doesn't make it so. And there's no evidence in the record that actually moved things inside. It's not implausible on its face, right? If you take a bunch of functions out of the thing that needs to be on the outside, it sort of stands to reason that you might need less space both for the items performing the function and for the power enabling them to do it. I agree that it rises to an interest. There is a generic interest to do that. But there's not evidence that there would actually be a product that would be smaller. And that would not change the principle of operation. I guess that gets back to that it would change the entire principle of operation. Because the way this device is designed is designed to have this external conductor on the outside that is vibrating this magnet on the inside. And that's the whole principle of operation that it's designed to do. And if there aren't any other further questions, I think we'll rest, Your Honor. Thank you. Thank you, Mr. Anderson. Okay, Mr. Anderson. You have three minutes on the cross-appeal, please. So just to touch further on the issue of Claims 7 through 10. Again, I think it's important to recognize that the Board conducted their own analysis of these claims. It wasn't an issue with respect to the petition being deficient in terms of maybe pointing to irrelevant parts or confusing parts of the record for a claim construction. Here the Board, starting on page 20, conducted their own analysis and found that there's simply no distinguishing structure in the 040 patent for the elements of Claims 7 through 10. Our position is that the lack of distinguishing detail in the 040 patent should not make these claims immune from an IPR challenge. The patent owner's argument now seems to be... Would you understand footnote 3 in SAMHSA, if you remember what that says? With respect to Estoppel? With respect to Estoppel, to mean that if in a district... The Board did not rule on the merits of obviousness here. It couldn't rule on the merits of indefiniteness because that's not part of the IPR process. So in district court, you would have an indefiniteness challenge remaining. And if the district court disagreed with you and found that it was definite, contrary to the reasoning, by definition not the holding of the IPR Board, then there would be no Estoppel for you to raise your obviousness challenge then and there. I think that's what footnote 3 indicates. That's my reading of footnote 3. However, since the issue before the court was one of a final written decision, which did not deal with the issue of the scope of Estoppel, it wouldn't surprise me that a patent owner would argue that that is merely dicta and that they would actually... It certainly wouldn't surprise me that they would actually raise an Estoppel, IPR Estoppel type defense, despite what's in footnote 3. And as to your point about if Estoppel doesn't apply, then the accused infringer is free to argue indefiniteness in prior art in district court. The IPR statute provides... Well, the accused infringer is entitled to argue indefiniteness in district court. Well, it's a wholly apart from Estoppel because the Board could not in law rule on indefiniteness in this case. Sure. I was referring to the second part. You said if the court disagreed with indefiniteness, then they could do prior analysis. Well, that leads us back into the situation of the district court not being the best, most efficient jurisdiction for prior art review. The IPR statute recognizes that... Okay, be careful about saying district courts can't do these things. I'm not saying they can't do it, of course, but in terms of an efficient way, particularly when we've been going through this case for over two years, the PTO simply decided that we're not going to decide obviousness for these claims, even though the patent owner is admitting that means for digital signal processing is a known digital signal processor. You know, the notion that the Board would have needed to engage in speculative assumptions to conduct obviousness analysis, we disagree with that notion. Here, where you have a clear admission from the patent owner regarding an example of prior art that would satisfy their claim and no argument that they've disclosed anything distinguishing over what was already available in the prior art, I believe in this case, even if there's not a sweeping holding that the PTAB must always perform obviousness analysis, even if the claims are indefinite. Here, I think we have a situation where the patent owner's own admission made it such that the PTAB clearly could have conducted an obviousness analysis. Okay, any more questions? Thank you. Thank you both. The case is taken under submission.